NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220499-U

NO. 4-22-0499

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 1, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| QUINCY WRIGHT, | ) | No. 21CF2089 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randy Wilt, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, concluding (1) the State properly authenticated photographs from a cellular phone, (2) defense counsel was not ineffective for failing to file motions to sever charges and redact video footage, (3) the trial court did not abuse its discretion in admitting testimony regarding defendant matching a suspect description, and (4) no errors occurred such that their cumulative effect deprived defendant of a fair trial.

¶ 2     Defendant, Quincy Wright, appeals from his convictions for unlawful use of a weapon by a felon, a Class 3 felony (720 ILCS 5/24-1.1(a) (West 2020)) (count I) and aggravated fleeing or attempting to elude a peace officer, a Class 4 felony (625 ILCS 5/11-204.1(a)(1) (West 2020)) (count II). Specifically, defendant argues (1) the trial court erred when it admitted allegedly unauthenticated cellular phone (cell phone) photographs into evidence, (2) ineffective assistance of trial counsel, (3) the trial court erred when it admitted

improper hearsay evidence, and (4) the cumulative effect of these alleged errors deprived him of a fair trial. The State responds no errors occurred and defendant's convictions and sentences should be affirmed. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                        A. Charges

¶ 5        On October 26, 2021, the State charged defendant by criminal complaint with one count of unlawful use of a weapon by a felon, a Class 3 felony (720 ILCS 5/24-1.1(a) (West 2020)) (count I) and aggravated fleeing or attempting to elude a peace officer, a Class 4 felony (625 ILCS 5/11-204.1(a)(1) (West 2020)) (count II). Count I alleged defendant, after being convicted of a felony in Winnebago County Case No. 15-CF-519, knowingly possessed a 50-round, .40-caliber "drum" magazine containing 31 live rounds of ammunition prohibited under section 24-1 of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/24-1 (West 2020)). Count II alleged defendant, having been given a visual or audible signal by police officer Lucas Limberg directing him to stop, willfully refused to obey the direction and fled from Officer Limberg in violation of section 11-204(a) of the Illinois Vehicle Code (625 ILCS 5/11-204(a) (West 2020)), and during said flight, drove at a rate of at least 21 miles per hour over the legal limit. On November 17, 2021, the criminal complaint was superseded by bill of indictment. Defendant was also cited for leaving the scene of an accident, improper passing on the shoulder, and driving without a license.

¶ 6                                        B. Jury Trial

¶ 7        The trial court conducted defendant's jury trial in February 2022.

¶ 8                                    1. *State's Case-in-Chief*

¶ 9                                    a. Officer Jacob Roberts

¶ 10        Officer Jacob Roberts testified he was currently employed as an officer with the Loves Park police department, where he had served for seven years. On October 25, 2021, around 5 p.m., Officer Roberts was on patrol duty when he was dispatched to a car accident on North Second Street. Another police officer, Officer Limberg, was on already on scene when Officer Roberts arrived. Officer Roberts observed a red Pontiac on the roadway that was facing the wrong direction as well as red paint transfer marks on the median. Upon searching the Pontiac, Officer Roberts recovered an iPhone cell phone, handgun magazines, and a larger drum magazine. Officers photographed these items within the Pontiac. The State then introduced People's exhibit Nos. 1-5, which Officer Roberts testified were the photographs taken of the items in the Pontiac on October 25, 2021. The trial court admitted the exhibits over defendant's objection.

¶ 11        After seizing the items from the Pontiac, Officer Roberts brought them to the police department where he then transferred them to Officer Limberg. The State then introduced People's exhibit No. 23, which Officer Roberts testified was the iPhone he seized from the Pontiac, and People's exhibit No. 10, which was the drum magazine. Officer Roberts testified when he found the drum magazine, it contained live rounds of ammunition. The State also introduced People's exhibit Nos. 11 and 12, which were two pistol magazines.

¶ 12        On cross-examination, Officer Roberts testified he did not author a report after searching the Pontiac. When he transferred the items from the Pontiac to Officer Limberg, he did not prepare a report or otherwise document the transfer.

¶ 13                            b. Detective Brian Cascio

¶ 14        Detective Brian Cascio testified he was currently employed as a detective with the Loves Park police department. On November 3, 2021, Officer Limberg requested Detective

Cascio's assistance with retrieving data from a black iPhone. Officer Limberg provided the iPhone to Detective Cascio, which Detective Cascio then identified as People's exhibit No. 23. After receiving the iPhone, Detective Cascio performed a forensic extraction on the iPhone's subscriber identity module (SIM) card. After completing the extraction, Detective Cascio handed the iPhone back to Officer Limberg.

¶ 15                                    c. Detective Adam Wolgast

¶ 16         Detective Adam Wolgast testified he was currently employed as a detective with the Loves Park police department. On November 8, 2021, Officer Limberg asked Detective Wolgast for assistance with an iPhone that was stored in an evidence locker at the police department. Detective Wolgast retrieved the iPhone from the evidence locker and drove it to the Federal Bureau of Investigation (FBI) office in Rockford. Upon arrival, Detective Wolgast presented the iPhone to Officer Jim Lake. Detective Wolgast identified People's exhibit No. 23 as the iPhone he retrieved from the Loves Park police department evidence locker and gave to Officer Lake.

¶ 17                                    d. Stipulations

¶ 18         Following a brief recess, the State introduced People's exhibit No. 20, which was a stipulation. The State then read the stipulation into the record, stating if Eric Taylor was called to testify, he would testify to the following:

> "On October 25, 2021, Eric Taylor was residing at 3 Jacoby Place in
> Rockford, Illinois. On that residence he has surveillance cameras mounted. A
> camera was mounted on his residence pointing towards the driveway and street.
> The surveillance system records continuously and on October 26, 2021, Eric
> Taylor allowed Officer Limberg to record a short clip from his home surveillance

- 4 -

system. On October 25, 2021, the surveillance system was operating properly. *** This video clip from Eric Taylor is marked as People's Exhibit 14 and the parties stipulate to the foundational requirements."

¶ 19 The State also introduced People's exhibit No. 21, which was another stipulation. The parties stipulated defendant had been previously convicted of a qualifying forceful felony offense.

¶ 20 e. Officer Limberg

¶ 21 Officer Limberg testified he was currently employed as an officer with the Loves Park police department. Around 5 p.m. on October 5, 2021, Officer Limberg was on patrol duty driving southbound on North Second Street. Officer Limberg observed a red Pontiac with an expired registration sticker driving in the lane next to him. Upon checking the registration through the Secretary of State, Officer Limberg confirmed the registration had expired in 2017 and belonged to a Nissan, not a Pontiac.

¶ 22 After the driver of the Pontiac noticed Officer Limberg next to him, the Pontiac slowed down and moved behind Officer Limberg's squad car. Officer Limberg could not see what the driver looked like because the windows were tinted. Officer Limberg pulled into a nearby turn lane and waited for the Pontiac to pass him, which it did. Officer Limberg then pulled behind the Pontiac again and activated the lights on his squad car to initiate a stop. The Pontiac then accelerated and did not stop, so Officer Limberg pursued it. When the Pontiac reached the intersection of North Second Street and Beacon Street, the traffic signal was red to continue southbound. The Pontiac drove onto the right shoulder of the road and passed the line of waiting cars, disregarding the red light. Officer Limberg stopped pursing the Pontiac at this time because he believed it would be dangerous to continue. Officer Limberg pulled over for a

few minutes and then continued southbound on North Second Street. As he neared the ramp on Spring Creek Road, he noticed several cars were stopped before observing the red Pontiac had crashed into the median and was now facing the opposite direction of traffic.

¶ 23        The State then introduced People's exhibit No. 13, which Officer Limberg testified was a disc containing video footage from his squad car's dashboard camera on October 25, 2021. The disc was admitted into evidence with no objection and published to the jury while Officer Limberg testified regarding its contents. After observing the Pontiac had crashed into the median, Officer Limberg approached the vehicle and noticed no one was inside and music was playing. The music appeared to be playing from an iPhone he found on the floorboard, which he then picked up and placed on the driver's seat. Officer Limberg also spoke to an individual named James Peterson who was present at the scene. Peterson provided Officer Limberg information regarding the direction the driver of the Pontiac had fled and a general description of the individual. Officer Limberg relayed the description to dispatch and other police officers. Thereafter, Officer Limberg returned to the Pontiac and began to search for identifying information when he observed a drum-style magazine that was loaded with ammunition on the rear seat. The drum magazine contained 31 live rounds of .40-caliber ammunition. Officer Limberg found a second magazine on the floorboard and a third magazine in the center console. Officer Limberg placed these items on the driver's seat where other officers later collected them. Officers Roberts and Baird physically handed Officer Limberg the items after the vehicle had been towed and they returned to the police department.

¶ 24        Officer Limberg testified People's exhibit No. 23 was the iPhone he recovered from the Pontiac, which he recognized by the case and phone grip attached to it. Once he obtained a search warrant for the iPhone, Officer Limberg marked it with evidence tape, where

he wrote his initials and badge number. Officer Limberg also identified People's exhibit Nos. 10, 10A, 11, and 12, which were the drum magazine, ammunition from the drum magazine, the magazine from the floorboard, and the magazine from the center console, respectively. Officer Limberg also identified People's exhibit Nos. 6 to 9, which were the photographs of the aforementioned items. All of the identified exhibits were admitted into evidence without objection.

¶ 25 While Officers Roberts and Baird waited with the Pontiac for the tow truck, Officer Limberg left with his canine partner, Blitz, to look for the driver. Officer Limberg and Blitz tracked the driver's scent southeast of the scene toward a heavily wooded area, which led into a residential lot located at 3 Jacoby Place. Blitz led Officer Limberg through the backyard, into the front yard, onto the street, and then south toward Sinnissippi Park. Around this time, Officer Limberg heard from another officer that he had a suspect in custody matching the description provided. When Officer Limberg arrived to observe defendant, he was wearing a blue sweater jacket, jeans, and tennis shoes that had fresh mud and dirt on them. Officer Limberg identified the person in custody as defendant. At the time defendant was placed into custody, he did not have a cell phone or any other items on his person.

¶ 26 As part of his investigation, Officer Limberg went to 3 Jacoby Place, where he met with Eric Taylor, who informed Officer Limberg the residence had a surveillance system. Taylor allowed Officer Limberg to record footage the system had captured from October 25, 2021. The State then introduced People's exhibit No. 14, which Officer Limberg testified was the footage he recorded from the surveillance system. The exhibit was admitted with no objection and published to the jury. In the video footage, an individual wearing a blue hooded jacket and light-colored pants can be seen walking in a driveway near a parked vehicle.

¶ 27        Officer Limberg testified when he obtained the iPhone from the Pontiac, it was password protected. However, Officer Limberg was able to open the widget menu, which contained thumbnails of frequently used applications. One of the thumbnails was the photo application, where Officer Limberg observed a picture of defendant. Officer Limberg took a photograph of the screen with defendant's picture and uploaded it to the police department's photograph service. At trial, Officer Limberg identified People's exhibit No. 15 as the photograph he took, which was admitted into evidence without objection and published to the jury.

¶ 28        On cross-examination, Officer Limberg repeated that he did not see what the driver of the Pontiac looked like or whether there were any other passengers present. Officer Limberg did not see the Pontiac crash into the median.

¶ 29                          f. Special Agent Kyle Young

¶ 30        Special Agent Kyle Young testified he was employed as a special agent with the FBI and was currently assigned to the regional computer forensic laboratory (RCFL) in Chicago. As part of his duties, Agent Young conducted forensic examinations of digital media such as computers, cell phones, and other electronic storage devices. On November 9, 2021, Officer Lake asked Agent Young to assist in obtaining evidence from an iPhone in connection with this case. Upon receipt of the iPhone from Officer Lake, Agent Young connected it to a computer and ran an extraction program. Agent Young successfully extracted data from the iPhone and copied it to a hard drive. When complete, Agent Young returned the iPhone to Officer Lake along with the hard drive. Agent Young identified People's exhibit No. 23 as the iPhone on which he performed the extraction, which he recognized by the unique case number printed on the bar code label attached to the iPhone.

¶ 31                    g. Officer Jim Lake

¶ 32        Officer Lake testified he was currently employed with the Rockford police department and was assigned as a task force officer with the RCFL Rockford satellite office. On November 8, 2021, Detective Wolgast asked Officer Lake to assist with the extraction of an iPhone in connection with this case. Upon receipt of the iPhone, Officer Lake processed the device by assigning it a case number and placing an evidence tag on it. On November 9, 2021, Officer Lake brought the iPhone to the Chicago regional computer forensic laboratory, where he provided it to Agent Young for extraction. Agent Young returned the iPhone to him after completing the extraction, along with a hard drive containing the raw data copied from it. Because raw data is not decipherable, Agent Young used the Cellebrite physical analyzer program to process the data into a readable format. Officer Lake identified People's exhibit No. 23 as the iPhone Detective Wolgast brought to him for extraction. Officer Lake additionally identified People's exhibit No. 24 as the SIM card that was inside People's exhibit No. 23 along with a Blu-ray disc containing the data obtained from the iPhone extraction. People's exhibit Nos. 23 and 24 were admitted with no objection.

¶ 33                 h. Detective Wolgast

¶ 34        The State recalled Detective Wolgast to testify. Detective Wolgast recognized People's exhibit No. 24 as the SIM card and Blu-ray disc Officer Lake provided to him. Detective Wolgast testified Officer Lake returned the iPhone to him along with the SIM card and disc on November 12, 2021. Upon receipt of these items, Detective Wolgast drove them back to the Loves Park police department and gave them to Officer Limberg.

¶ 35                 i. Officer Limberg

¶ 36    The State also recalled Officer Limberg to testify. Officer Limberg recognized People's exhibit No. 24 as the disc Detective Wolgast gave him when he returned from the RCFL. Officer Limberg reviewed the contents of the disc on his computer and packaged it into evidence when he was finished. The State then introduced People's exhibit Nos. 16 to 19, which Officer Limberg testified were photographs he obtained from the disc. Specifically, Officer Limberg testified exhibit No. 16 was a "selfie" photograph of defendant, exhibit No. 17 was an Illinois identification card for defendant, exhibit No. 18 was a social security card for defendant, and exhibit No. 19 was a photograph of a drum-style firearm magazine resembling the one he retrieved from the Pontiac along with a firearm. Exhibit Nos. 16 to 19 were admitted with no objection and published to the jury.

¶ 37    j. James Peterson

¶ 38    James Peterson testified on October 25, 2021, he worked for ComEd repairing, maintaining, and building substations. As part of his employment, he drove a ComEd-owned truck. Around 5 p.m. that day, Peterson was driving his work truck on Forest Hills Road and merged onto North Second Street traveling southbound. As he approached the Auburn ramp, Peterson noticed a red vehicle pass him, lose control, and fishtail 180 degrees into the median. After crashing into the median, the driver exited before Peterson could approach and offer to assist. Peterson testified the driver was a medium-heavy build, dark-skinned man with short hair, wearing a blue jacket and dark jeans. Peterson testified the driver had a gun in his hand. After the driver noticed Peterson, he rolled over the median wall and proceeded east toward the trees near the Spring Creek ramp and in the direction of Keith Country Day School. Peterson called 911 to report what he saw.

¶ 39    k. Nicole Swanson

¶ 40    Nicole Swanson testified she was employed as a nanny and worked at the residence located at 3 Jacoby Place. On October 25, 2021, around 5 p.m., Swanson noticed a man walking through the driveway of the home. Swanson found this unusual because, "normally people don't walk around there," and the residence was a "very private area." Swanson testified the man was wearing a blue hooded jacket with the hood up over his head and a pair of jeans. Swanson only caught a glimpse of the man for a few seconds and reported what she saw to the police.

¶ 41                           l. Deputy Matthew Hines

¶ 42    Deputy Matthew Hines testified he was currently employed as a deputy sheriff with the Winnebago County Sheriff's Office. Around 5 p.m. on October 25, 2021, Deputy Hines was on patrol when he "heard over the radio that a car had crashed somewhere in the vicinity that had just fled from Loves Park Police officers." Although not dispatched himself, Deputy Hines responded on his own accord because he was nearby.

¶ 43    After meeting with Loves Park officers at the accident scene, Deputy Hines learned the direction in which the driver had fled and drove toward Sinnissippi park to locate him. When asked what he observed there, Deputy Hines testified, "I observed the—a heavy-set black male, which is the description I got, walking—" to which defendant's counsel objected. The trial court overruled the objection, and Deputy Hines continued, "I observed a heavy-set black male, walking down the path wearing a black and blue hooded zip-up sweatshirt and light blue jeans walking down the paved path toward the clubhouse at Sinnissippi Golf Course." Deputy Hines ordered the individual to show him his hands. Deputy Hines then testified, "I got on the radio and had dispatch confirm what the suspect was wearing. When I realized it matched—" to which defendant's counsel again objected. The court overruled the objection.

Deputy Hines testified, "I asked dispatch to tell me, refresh what the suspect was wearing, and when I realized that the suspect was wearing what dispatch told me—" to which defense counsel objected based on hearsay. The court overruled the objection, stating the testimony was not hearsay because it was not being offered for the truth of the matter asserted. Deputy Hines testified he took the individual into custody after confirming the suspect's description with dispatch. Deputy Hines identified defendant as the individual he took into custody.

¶ 44    The State introduced People's exhibit No. 22A, which Deputy Hines testified contained footage from his body-worn camera on October 25, 2021. The exhibit was admitted into evidence without objection and published to the jury. The body-worn camera footage shows Deputy Hines at the scene of the accident speaking with the other officers. In the background, dispatch can be heard saying, "There's a black male, short, heavy-set, wearing white and blue, seen going south." Officer Limberg can then be heard repeating, "Black dude, heavy-set."

¶ 45    Afterward, Deputy Hines returns to his vehicle and drives away. He later passes an individual not on camera and stops to roll down his window and ask, "You guys seen a heavy-set black male walking around through here?" Soon after, Deputy Hines stops his car and begins yelling instructions for someone not on camera to get on the ground. Over the radio, a voice can be heard saying, "Black and blue, like, short and heavy-set." Deputy Hines then replies, "I got him," and then yells to the person off-screen, "Lay on your belly. Lay on your stomach and face away from me!" When asked over the radio whether he has a suspect in custody, Deputy Hines responds, "10/4, black male, heavy-set, blue jeans, blue hoodie with black."

¶ 46    After the video footage was published to the jury, the trial court addressed the jury as follows:

"Before you go any further with that, ladies and gentlemen, I'm going to remind you of something. The video that we heard had radio transmissions on it. We talked about that before, that's something that maybe the officer listened to or heard to help explain his conduct. That is not admissible into evidence. Anything you heard that was a radio broadcast as a part of that video has to be disregarded by you. It has no evidentiary value[,] do you understand?"

The report of proceedings indicates the jury collectively responded affirmatively.

¶ 47 The State then played video footage of Deputy Hines's squad car after defendant was placed in the back seat. In the video footage, Deputy Hines compliments defendant on his cooperation and demeanor and asks whether defendant has ever been arrested. Defendant responds affirmatively, and when asked what he had been arrested for, defendant states, "All type of stuff."

¶ 48 On cross-examination, Deputy Hines agreed that when he encountered defendant, he was "walking nonchalantly" and not running. Additionally, Deputy Hines agreed defendant was very cooperative and respectful to the point Deputy Hines thanked defendant for his behavior.

¶ 49 The State rested, and the trial court denied defendant's motion for a directed verdict. Defendant's counsel indicated he would not be presenting evidence and the court adjourned for the day. The next morning, the court stated it would be granting a directed verdict on defendant's citation for leaving the scene of an accident. Accordingly, that citation was dismissed.

¶ 50 *2. Verdict and Sentencing*

¶ 51    Following closing arguments and jury deliberations, the jury found defendant guilty on all remaining counts. Defendant filed a motion for a new trial, arguing the State failed to prove him guilty on all counts beyond a reasonable doubt. The trial court denied the motion.

¶ 52    At sentencing, the State introduced certified copies of defendant's convictions for aggravated unlawful possession of a stolen vehicle and residential burglary. The trial court sentenced defendant to concurrent sentences of 10 years in prison for unlawful use of a weapon and 4 years in prison for aggravated fleeing.

¶ 53    This appeal followed.

¶ 54                        II. ANALYSIS

¶ 55    On appeal, defendant presents four arguments. First, defendant asserts the State failed to properly authenticate the photographs taken from the iPhone found in the Pontiac and the trial court therefore erred when it allowed the admission of the iPhone and its contents. Second, defendant contends his trial counsel was ineffective when he failed to file motions to sever the traffic offenses and to redact Deputy Hines's body-worn camera footage. Third, defendant argues the court abused its discretion when it allowed the admission of improper double and triple hearsay testimony regarding the suspect description. Finally, defendant claims the cumulative effect of these errors deprived him of a fair trial in violation of his due process rights.

¶ 56                    A. Authentication of Photographs

¶ 57    Defendant asserts the trial court erred when it allowed the admission of the iPhone found in the Pontiac along with the photographs obtained from it because the State failed to properly authenticate them. Specifically, defendant argues the State failed to introduce any evidence the iPhone was registered to defendant, defendant used or possessed the iPhone, or that

it had been in his possession before it was found in the car. Defendant acknowledges he forfeited this argument because defense counsel failed to contemporaneously object to the exhibits' admission at trial and raise the issue in a posttrial motion. However, defendant asserts this court should review the issue under the plain error doctrine. The State responds the court properly admitted the exhibits and no error occurred. We agree with the State.

¶ 58                                    1. *Plain Error Review*

¶ 59        To preserve an alleged error for review, a criminal defendant must raise a contemporaneous objection at trial and file a timely posttrial motion. *People v. Kitch*, 239 Ill. 2d 452, 461, 942 N.E.2d 1235, 1240 (2011). A defendant's failure to preserve the issue for review results in forfeiture. *Id.* However, this court may consider a forfeited argument when the defendant demonstrates plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under the plain error doctrine, the defendant must demonstrate a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "t[he] error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Accordingly, we first consider whether a clear or obvious error occurred. *Id.* ¶ 49.

¶ 60                                    2. *Authentication*

¶ 61        Under Illinois Rule of Evidence 901(a) (eff. Sep. 17, 2019), "[t]he requirement of authentication or identification" of evidence is a "condition precedent to admissibility" and is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Stated differently, authentication of evidence is a necessary part of laying a

- 15 -

proper foundation for its admission. *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51, 100 N.E.3d 635. An example of authentication conforming with the requirements of Rule 901(a) includes "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics of an item, including those that apply to the source of an electronic communication, taken in conjunction with the circumstances." Ill. R. Evid. 901(b)(4) (eff. Sep. 17, 2019). "Documentary evidence *** may be authenticated by its contents if it is shown to contain information that would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author." *Ziemba*, 2018 IL App (2d) 170048, ¶ 52. This may be accomplished through either direct or circumstantial evidence. *Id.* Additionally, "the proponent need prove only a rational basis upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged." *Id* ¶ 51. Contents retrieved from a cell phone are treated like any other form of documentary evidence with the same authentication requirements. See *id.*

¶ 62        In *People v. Watts*, 2022 IL App (4th) 210590, ¶ 82, this court stressed that the "bar for authentication of evidence is not particularly high." (Internal quotation marks omitted.) This court further explained as follows:

> "Once an item of evidence is authenticated[,] this merely renders [evidence]
> admissible, leaving the issue of [its] ultimate reliability to the jury, for which the
> opposing party remains free to challenge the reliability of the evidence, to
> minimize its importance, or to argue alternative interpretations of its meaning,
> with all such challenges going to the weight of the evidence rather than its initial
> admissibility." (Internal quotation marks omitted.) *Id.*

¶ 63 This court reviews a trial court's decision on the admission of evidence for an abuse of discretion. *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 75, 44 N.E.3d 632. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the trial court's position." *People v. Brand*, 2021 IL 125945, ¶ 36, 190 N.E.3d 149.

¶ 64                                    3. *This Case*

¶ 65 Defendant argues the State failed to properly authenticate the iPhone and photographs because it never offered evidence showing the iPhone the photographs were retrieved from was registered to defendant, that he used or possessed it, or that it had been in his possession before it was found in the car. In support of this argument, defendant asserts his case is similar to *People v. Kent*, 2017 IL App (2d) 140917, 81 N.E.3d 578, and *People v. Watkins*, 2015 IL App (3d) 120882, 25 N.E.3d 1189.

¶ 66 In *Kent*, the defendant was convicted of first degree murder in that he shot and killed Donmarquis Jackson. *Kent*, 2017 IL App (2d) 140917, ¶ 3. Jackson had been found dead in his driveway. *Id.* ¶ 4. At trial, the State, over the defendant's objection, was permitted to present as evidence a screenshot of a Facebook post from the profile of "Lorenzo Luckii Santos." *Id.* ¶ 55. The screenshot of the post, which a detective obtained the day after the murder, showed a photograph of someone allegedly resembling the defendant and a caption reading, " 'its my way or the highway..... leave em dead n his driveway.' " *Id.* ¶ 57. As foundation for the admission of this evidence, the State presented the testimony of the detective who obtained the post by searching the Facebook website. *Id.* ¶ 57. The detective testified he found a profile under the name "Lorenzo Luckii Santos" with the defendant's photograph and the relevant post. *Id.*

¶ 67        The defendant appealed, arguing the trial court abused its discretion when it allowed the admission of the Facebook post because the State failed to properly authenticate it. *Id.* ¶ 66. The Second District agreed, concluding "the State offered neither direct nor circumstantial proof of authentication." *Id* ¶ 103. Specifically, the Second District found that although the State offered evidence that the name on the Facebook profile matched a nickname used by the defendant, that the victim was killed in his driveway, and that the photograph on the profile allegedly resembled defendant, it nonetheless failed to offer any evidence that the defendant ever accessed the Facebook profile or even used the internet. *Id.* ¶¶ 103-104. Furthermore, it presented no evidence that the information contained in the post or on the Facebook profile was known or available only to the defendant or a small group of people including the defendant. See *id.* ¶ 116. Accordingly, the Second District reversed and remanded for a new trial. *Id.* ¶ 135.

¶ 68        In *Watkins*, the State was allowed to introduce into evidence photographs of text messages from a cell phone found in a house where the defendant and five others were arrested for drug-related offenses. *Watkins*, 2015 IL App (3d) 120882, ¶¶ 7-8. During a search of the home, officers found the phone in a drawer next to two other phones, drugs, and drug paraphernalia. *Id.* ¶ 11. On appeal, the defendant argued the State did not lay a proper foundation for the text messages because it failed to present evidence that the defendant had used the phone and received those messages and there was "no testimony from the sender or receiver of the messages as to who authored the messages." *Id.* ¶ 32. The Third District agreed, concluding no proper foundation had been laid for the admission of the text messages. *Id.* ¶ 38. The Third District specifically noted the lack of any eyewitness testimony showing the phone "had been used by [the] defendant or that the messages were being sent to [the] defendant." *Id.* Finding this

error was not harmless, the Third District reversed the defendant's conviction and remanded for a new trial. *Id.* ¶ 52.

¶ 69          Contrary to defendant's assertions, his case is distinguishable from both *Kent* and *Watkins*. Unlike those cases, the State in this case presented circumstantial evidence defendant possessed the iPhone found in the Pontiac. This is not a situation where the iPhone was found in a home with multiple occupants. The Pontiac was left abandoned by the driver on the interstate after he ran into the median. Although no witness positively identified defendant as the individual who exited the Pontiac after the accident, Peterson provided a description of the individual he saw leaving the Pontiac to police. Officer Limberg and Deputy Hines testified when they apprehended defendant, he matched the description of the person Peterson provided. Swanson testified she saw a man matching the description of the suspect in the driveway of the secluded home where she worked, which was in the area the suspect was seen fleeing toward after the accident. She further testified it was unusual to see anyone walking in this area because it was a very private place. Officer Limberg testified defendant's shoes had fresh mud on them, which further supported the State's theory defendant had fled from the Pontiac and into the nearby woods before Deputy Hines apprehended him. When he was taken into custody, defendant was not in possession of a phone. Moreover, unlike the cell phone in *Watkins* that was found in a home inhabited by multiple individuals, Peterson testified only one individual exited the Pontiac after the accident. Additionally, the phone was located on the floor in front of the driver's seat with music playing. Finally, Officer Limberg, Officer Lake, Detective Wolgast, Detective Cascio, and Special Agent Young all testified regarding the chain of custody of the iPhone. Construing this evidence in the light most favorable to the State, the State presented a rational basis, based on circumstantial evidence, from which a juror could conclude that

defendant was the driver and sole occupant of the Pontiac and therefore possessed the iPhone found within it. See *id.* ¶ 36.

¶ 70 Furthermore, the photographs retrieved from the iPhone served as authenticating evidence based on their contents. Unlike the Facebook post in *Kent*, which could have been authored by anyone with an internet connection and knowledge of the defendant's nickname, two of the photographs in this case contained sensitive information about defendant that "would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author." *Ziemba*, 2018 IL App (2d) 170048, ¶ 52. Specifically, People's exhibit Nos. 17 and 18 were photographs of defendant's Illinois identification card and social security card, respectively. These are not the type of items that would be photographed or viewed by the general public. Accordingly, the State presented a rational basis, based on the contents of the iPhone and the nature of photographs within it, from which a juror could conclude that the iPhone and its contents "did in fact belong to or w[ere] authored by" defendant. *Id.* ¶ 51.

¶ 71 Because the State properly authenticated the iPhone and photographs in this case, the trial court did not abuse its discretion when it allowed their admission into evidence. Accordingly, no clear or obvious error occurred, and we need not proceed further with a plain error analysis. See *Sebby*, 2017 IL 119445, ¶ 49.

¶ 72 B. Ineffective Assistance of Counsel

¶ 73 Defendant next asserts his trial counsel was ineffective when he failed to file motions to (1) sever the charge of unlawful use of a weapon by a felon from the traffic offenses and (2) redact portions of Deputy Hines's body-worn camera footage, which contained improper other-crimes evidence that was prejudicial to defendant. The State responds counsel's

performance was not deficient but instead constituted sound trial strategy. We agree with the State.

¶ 74                                    1. *Ineffective Assistance Claims*

¶ 75            Claims of ineffective assistance of counsel are governed by the familiar two-part framework announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Poole*, 2012 IL App (4th) 101017, ¶ 8, 972 N.E.2d 340. Under this standard, a criminal defendant must show both deficiency and prejudice. *Id.* Trial counsel's performance is deficient if it falls below an objective standard of reasonableness, and a defendant is prejudiced by that deficiency when, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different. *Id.* A defendant's failure to demonstrate either prong is fatal to an ineffective assistance claim. *Id.*

¶ 76            The deficiency prong of *Strickland* measures counsel's performance against prevailing professional norms. *Id.* ¶ 10. "In considering whether counsel's performance was deficient, a court must indulge a strong presumption that the challenged action, or inaction, was the result of sound trial strategy." *Id.* Typically, counsel's decisions on what motions to file or not to file are regarded as matters of trial strategy. *Id.*

¶ 77                                      2. *Motion to Sever*

¶ 78            In *Poole*, this court discussed why counsel might choose not to file a motion to sever as follows:

        "A major disadvantage of a severance is that it gives the State two bites at
        the apple. An evidentiary deficiency in the first case can perhaps be cured in the
        second. 'Perhaps trial counsel felt that it made sense to try for an acquittal of both
        counts in one proceeding, thinking that the impact of the additional conviction

- 21 -

would not be significant.' *People v. Gapski*, 283 Ill. App. 3d 937, 943, 670 N.E.2d 1116, 1120 (1996) (a case where one felony would have been admissible even if the two counts were severed).' " *Id.*

Accordingly, "defense counsel may choose to pursue an 'all or nothing' trial strategy, in which the defendant is acquitted or convicted of all charges in a single proceeding." *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28, 75 N.E.3d 503. "The mere fact that an 'all-or-nothing' strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance." *Id.*

¶ 79        However, trial counsel's decision not to seek severance may amount to deficient performance in circumstances such as those presented in *People v. Utley*, 2019 IL App (1st) 152112, 142 N.E.3d 352. In *Utley*, the defendant was convicted of possession of a controlled substance with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon. *Id.* ¶ 1. On appeal, the defendant argued his trial counsel was ineffective for failing to seek severance of the drug charge from the armed habitual criminal and unlawful use of a weapon charges. *Id.* ¶ 39. Specifically, the defendant asserted that to prove the weapons charges, the State was required to introduce evidence of his prior convictions for aggravated battery with a firearm and delivery of a controlled substance, "neither of which would have been admissible to prove the possession of a controlled substance offense." *Id.* The defendant argued that had counsel sought severance under these circumstances, the trial court would have granted the motion. *Id.* The First District agreed, finding that "there existed a significant risk that the jury's knowledge that defendant had previously been convicted of aggravated battery with a firearm and unlawful delivery of a controlled substance would be used in determining his guilt or innocence of the instant, unrelated, offense." *Id.* ¶ 42. The First District further concluded the

State failed to identify any legitimate trial strategy served by defense counsel's decision not to sever the charges, and it found none in the record. *Id.* ¶ 48. Accordingly, the First District reversed the defendant's convictions and remanded the case for a new trial. *Id.* ¶ 70.

¶ 80 Here, defendant's case is distinguishable from *Utley* because the record shows trial counsel's decision not to sever the charges was a matter of sound trial strategy. In contrast to *Utley*, where the State introduced into evidence certified copies of the defendant's prior convictions for aggravated battery with a firearm and for unlawful delivery of a controlled substance, defense counsel in this case stipulated that defendant had "previously been convicted of a qualifying forcible felony offense." By entering this stipulation, defense counsel was able to avoid both (1) the State getting "two bites at the apple," which would have occurred if the charges had been severed (see *Poole*, 2012 IL App (4th) 101017, ¶ 10) and (2) the jury learning the nature of defendant's qualifying felony convictions—*i.e.*, aggravated unlawful possession of a stolen vehicle and residential burglary. See *Fields*, 2017 IL App (1st) 110311-B (holding counsel's decision not to seek severance was strategic where the court denied his motion *in limine* to bar admission of the defendant's prior convictions and instead he stipulated the defendant had qualifying prior convictions without specifying their exact nature). Accordingly, defense counsel's decision to stipulate to a qualifying conviction successfully minimized the high risk of prejudice inherent in disclosing defendant's prior conviction while simultaneously pursuing a permissible all-or-nothing strategy. See *People v. Moore*, 2020 IL 124538, ¶ 40, 161 N.E.3d 125.

¶ 81 Because defendant has not overcome the strong presumption defense counsel's decision not to file a motion to sever was a matter of sound trial strategy, his ineffective assistance claim necessarily fails. See *Poole*, 2012 IL App (4th) 101017, ¶ 8.

¶ 82                                3. *Motion to Redact*

¶ 83        Defendant also argues counsel was ineffective for failing to file a motion to redact

the portions of Deputy Hines's body-worn camera footage in which defendant admitted to

having been previously arrested for "all type of stuff." Defendant argues he was prejudiced by

the inclusion of this portion of the footage because it was irrelevant and exposed the jury to

inadmissible other-crimes evidence. The State responds defense counsel's decision not to file a

motion to redact was a matter of sound trial strategy and defendant was nonetheless not

prejudiced by that decision. We agree with the State.

¶ 84        Evidence is relevant if it has "any tendency to make the existence of any fact that

is of consequence to the determination of the action more probable or less probable than it would

be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Evidence of other crimes is

admissible if it is relevant for any purpose other than to show the defendant's propensity to

commit crime." *People v. Pikes*, 2013 IL 115171, ¶ 11, 998 N.E.2d 1247. Additionally, "[a]ny

statement by an accused person, unless excluded by the privilege against self-incrimination or

other exclusionary rules, may be used against him as an admission, even if it is not inculpatory or

against interest." *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 55, 144 N.E.3d 491.

Relatedly, "statements made by an investigating officer during an interview with the suspected

defendant are admissible if they are necessary to demonstrate the effect of the statement on the

defendant or to explain the defendant's response." *People v. Hardimon*, 2017 IL App (3d)

120772, ¶ 35, 77 N.E.3d 1184. "However, Illinois courts have long recognized, as a matter of

common law, that a trial court may exercise its discretion to exclude evidence, even when it is

relevant, if its prejudicial effect substantially outweighs its probative value." *People v. Walker*,

211 Ill. 2d 317, 337, 812 N.E.2d 339, 350 (2004); see also Illinois Rule of Evidence 403 (eff.

Jan. 1, 2011) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.").

¶ 85 Defendant argues his case is akin to *Hardimon*. In that case, the defendant was found guilty of first degree murder and unlawful possession of a weapon by a felon following a fatal shooting outside a nightclub. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 1, 5. The defendant had been allegedly kicked out of the night club after arguing with the victim. *Id.* ¶ 8. Following the shooting, investigators interviewed the defendant, who acknowledged that he had been outside the club when the shooting occurred but denied any involvement in the shooting and being ejected from the club. *Id.* ¶¶ 17-19. At the defendant's trial, a redacted video recording of the interview was published to the jury. *Id.* ¶ 15. On appeal, the defendant argued his defense counsel was ineffective when he failed to file a motion to further redact the recording of the interview. *Id.* ¶ 32. Specifically, the defendant asserted the final two-thirds of the recording should have been redacted because the contents were irrelevant and more prejudicial than probative. *Id.* The Third District agreed, concluding that only the first third of the recording contained relevant discussions and admissions. *Id.* ¶ 38. The Third District specifically found the final two-thirds of the recording contained irrelevant and highly prejudicial remarks from the investigators, who repeatedly told the defendant that he showed "no remorse," that the State would take the case to trial because it would be easy to convict him, and suggested the defendant was a "liar" and "cold-blooded killer." *Id.* ¶¶ 36-38. Significantly, the defendant maintained the same narrative throughout the interview. *Id.* ¶ 37. Although the Third District acknowledged that an investigating officer's statements during an interview with the suspected defendant are typically admissible, the final two-thirds of the footage in that case contained little probative

value compared to its highly prejudicial nature. *Id.* ¶ 38. Accordingly, the Third District reversed and remanded for a new trial. *Id.* ¶ 46.

¶ 86        The State responds this case is distinguishable from *Hardimon* and is more comparable to *People v. Dunbar*, 2018 IL App (3d) 150674, 127 N.E.3d 604. In *Dunbar*, police responded to a call of an infant not breathing at an apartment where the defendant lived with his girlfriend and her infant son. *Id.* ¶ 3. When the police arrived, the infant had no pulse and head injuries, and he later died at the hospital. *Id.* ¶¶ 3-12. At trial, video footage from an interview with the defendant was published to the jury. *Id.* ¶ 16. During closing arguments, defense counsel argued the defendant maintained his innocence throughout the interview despite intense pressure from interviewers, which supported the theory the defendant was being truthful. *Id.* ¶ 19. The jury found the defendant guilty of first degree murder and aggravated battery of a child, and on appeal, the defendant argued his defense counsel was ineffective for failing to move to redact portions of the interview. *Id.* ¶ 1, 51.

¶ 87        The Third District affirmed the defendant's conviction and sentence, concluding his case was distinguishable from *Hardimon*. *Id.* ¶ 51. The Third District found that unlike in *Hardimon*, where defense counsel did not attempt to use any portion of the video footage to assist in the defendant's theory of the case, defense counsel's decision not to file a motion to redact in *Dunbar* was a result of a sound trial strategy because he emphasized helpful portions of the interview during closing arguments. *Id.* ¶ 53. The court further concluded that the defendant's entire interview was nonetheless admissible as relevant and probative and the interviewers' tactics did not rise to the same prejudicial level as the interviewers' statements in *Hardimon*. *Id.* ¶ 54.

¶ 88 We conclude this case is distinguishable from *Hardimon* and more closely resembles *Dunbar* for several reasons. First, the defendant in *Hardimon* primarily took issue with the comments of his *interviewers*, who repeatedly, and over the course of several hours of video footage, referred to the defendant as a "cold-blooded killer" and a "liar" and insinuated he had no remorse for the victim. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 36-38. In contrast, defendant in this case takes issue with his *own* comments in the video footage, which vaguely alluded to his prior arrests, and which was limited to several seconds of the approximately 35 minutes of footage. Like the defendant in *Dunbar*, the statements defendant takes issue with do not rise even close to the prejudicial statements in *Hardimon*. Furthermore, like defense counsel in *Dunbar*, defense counsel in this case emphasized defendant's polite and cooperative demeanor as shown in the video footage during closing arguments to advance the theory defendant was not the driver of the Pontiac, which was a valid trial strategy.

¶ 89 Finally, while defendant correctly notes that evidence of prior arrests is generally inadmissible for impeachment purposes (*People v. Bohn*, 362 Ill. App. 3d 485, 490, 840 N.E. 2d 762, 766 (2005)), evidence of defendant's prior arrests in this case was not admitted for impeachment purposes. Rather, it was incidentally introduced within the context of relevant and admissible evidence of Deputy Hines's post-arrest interview with defendant. See *McCallum*, 2019 IL App (5th) 160279, ¶ 55, 144 N.E.3d 491 ("Any statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission, even if it is not inculpatory or against interest."). The post-arrest interview showed defendant's post-arrest demeanor and behavior, which is relevant to the issue of whether he displayed consciousness of guilt or a lack thereof. Because the statement was admitted as part of a valid trial strategy and was not more prejudicial than probative, defendant

has not shown defense counsel was ineffective for failing to file a motion to redact the video footage.

¶ 90                                    C. Hearsay Testimony

¶ 91            Defendant next asserts the trial court erred when it admitted testimony, predicated on double and triple hearsay, that defendant matched an out-of-court description provided to dispatch and repeated to the officers. The State responds the testimony was not hearsay because it was not offered for the truth of the matter asserted and instead offered for its effect on Deputy Hines and the course of his investigation. We agree with the State.

¶ 92            The confrontation clauses of the United States and Illinois Constitutions guarantee criminal defendants the right to confront the witnesses against him. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Hearsay evidence, which is an out-of-court statement used to prove the truth of the matter asserted, may violate that constitutional right because the declarant is not available for cross-examination. *People v. Jura*, 352 Ill. App. 3d 1080, 1085, 817 N.E.2d 968, 973-74 (2004). An arresting officer may "testify about statements made by others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted, but is instead used to show the investigative steps taken by the officer leading to the defendant's arrest." *People v. Pulliam*, 176 Ill. 2d 261, 274, 680 N.E.2d 343, 350 (1997). "The testimony of the officer regarding the words of the communication must not be used for their truth by the prosecution, but only used to show that the words were spoken when the fact they were spoken satisfies a relevant nonhearsay purpose." *Jura*, 352 Ill. App. 3d at 1086. "[S]uch evidence when admitted should be accompanied by an instruction to the jury describing the limited purpose for its admission." *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 29, 78 N.E.3d 566.

¶ 93     Because defendant challenges the admission of evidence, this court will not disturb the trial court's ruling absent an abuse of discretion. *Id.* ¶ 27. An abuse of discretion occurs when the court's decision is arbitrary, fanciful, or unreasonable. *Id.*

¶ 94     Here, the trial court did not abuse its discretion when it allowed Deputy Hines to repeat the suspect description he heard over the radio because it was not offered to prove the truth of the matter asserted but rather to explain his investigatory procedure in apprehending defendant in this case. When Deputy Hines's testimony is read in context, it was necessary for him to explain that defendant matched the description he was given by dispatch to show why, when he encountered defendant in Sinnissippi Park, he ordered defendant onto the ground and to show his hands. Deputy Hines testified that when he observed a heavy-set Black man walking through the park, he called over the radio to dispatch to confirm what the suspect was wearing and apprehended the individual when he "realized it matched." In this testimony, Deputy Hines did not repeat what dispatch told him, and he did not provide this information to prove that defendant, in fact, matched a description that dispatch gave him. Instead, Deputy Hines's statement was used to show why he apprehended *defendant* in particular instead of some other person in the vicinity—such as the off-camera individual he spoke to several minutes before arresting defendant. Furthermore, the court did not abuse its discretion in allowing the jury to hear repeated mentions of the description in the body-worn camera footage because the footage was also not admitted to prove defendant matched the description, but again to show why Deputy Hines became involved in defendant's arrest and how he proceeded after learning of the suspect's actions and movements. Additionally, the court specifically admonished the jury after publishing this footage as follows:

"The video that we heard had radio transmissions on it. We talked about that before, that's something that maybe the officer listened to or heard to help explain his conduct. That is not admissible into evidence. Anything you heard that was a radio broadcast as a part of that video has to be disregarded by you. It has no evidentiary value[,] do you understand?"

The jurors all agreed they understood. Accordingly, the court did not abuse its discretion in admitting this testimony and video footage because it was permissible to show Deputy Hines's investigative steps and was accompanied by an appropriate admonishment regarding the radio transmissions' lack of evidentiary value.

¶ 95                                    D. Cumulative Effect of Errors

¶ 96         Finally, defendant argues the cumulative effect of the aforementioned errors deprived him of a fair trial. Because we have concluded no errors occurred, we need not consider the cumulative effect of the alleged errors.

¶ 97                                    III. CONCLUSION

¶ 98         For the reasons stated, we affirm the trial court's judgment.

¶ 99         Affirmed.